## CHAPMAN *v.* FERRY and another.

(*Circuit Court, D. Oregon.* December 3, 1883.)

1. PRINTED COPY OF TITLE OF BOOK, ETC.

    The "printed" copy of the title of a book or other article, required by section 4956 of the Revised Statutes to be delivered or mailed to the librarian of congress, may be "printed" with a pen as well as type, with or without the aid of tracing paper.

2. DEPOSIT OF COPIES OF WORK WITH LIBRARIAN.

    The copies of a copyright work required by section 4959 of the Revised Statutes to be deposited with the librarian of congress within 10 days after publication, may be so deposited after the printing of the work and before its formal publication.

3. COPYRIGHT OF MAP—INFRINGEMENT OF.

    It is difficult to say, in some cases, what constitutes an infringement of the copyright of a map; but where the subsequent map appears to have been substantially copied from the prior one, without alteration or revision, except in scale and color, there is clearly an infringement, which authorizes a court of equity to enjoin the sale of such infringing map, and to require the publisher to account for the profits arising from the sale thereof.

Suit in Equity for an Injunction and an Account.

*H. Y. Thompson*, for plaintiff.

*Frederick V. Holman*, for defendants.

DEADY, J. This suit is brought against the defendants to obtain an injunction and an account, because of an alleged infringement by them of the plaintiff's copyright of a "Map of the Cities of Portland, East Portland, and the Town of Albina," obtained by him in 1874. The suit was commenced on May 13, 1881. A demurrer to the original bill was sustained, on the ground that the title of the map could not be copyrighted, and because it did not appear that the plaintiff had performed the several acts necessary to obtain a copyright. *Parkinson* v. *Laselle*, 3 Sawy. 330. On March 18, 1882, an amended bill was filed, to which a demurrer was sustained, so far as it prayed for a discovery of the number of copies of the defendants' map that had been disposed of and were still on hand, and for a surrender of the latter and the plates on which they were printed. 8 Sawy. 191; [S. C. 12 FED. REP. 693.]

It appears from the amended bill that at and before the commencement of this suit the plaintiff was the author and proprietor of a map of the cities and towns aforesaid, entitled as aforesaid, drawn upon a scale of about 800 feet to the inch, for which he duly obtained a copyright in the year 1874; that on May 10, 1881, the defendants published 500 copies of a certain map with the same title as the plaintiff's, and then and thereafter sold 300 copies of the same at five dollars a copy; and that in the preparation of said map the defendants copied the map of the plaintiff without alteration, except to enlarge the scale to 500 feet to the inch, and change the colors of the lines of the land claims upon which these towns are located, and thereby wrongfully appropriated the skill and labor of the

plaintiff. On September 15, 1882, the defendants answered so much
of the amended bill as was not included in the demurrer thereto, by
which they deny any knowledge or information as to the plaintiff's
alleged copyright, and admit the publication and sale of a map by
them, as stated in the bill, but allege that their map includes many
additions, improvements, and changes, not in the plaintiff's, and
deny that in the preparation of their map they copied the whole of
the plaintiff's map, but admit that they made use of said map for
comparison, and, in small part, for compiling their map, and allege
that by reason of the imperfections in the same, and the changes and
additions to the towns aforesaid since the publication thereof, and
prior to the publication of the defendants, the former had "become of
little value and unsalable."

It satisfactorily appears that the plaintiff duly complied with the law
in obtaining his copyright. The plaintiff testifies that he filed a trac-
ing of the printed title of his map with the librarian of congress, but
it is contended that this is not a "printed" copy of such title as is re-
quired by section 4956 of the Revised Statutes. The "copy" of such
title furnished the plaintiff by said librarian in pursuance of section
4957 of the Revised Statutes, does not indicate what was the char-
acter, in this respect, of the title deposited with him. It is described
in the certificate of the librarian simply as "the title of a map." A
tracing is a mechanical copy or *fac simile* of an original, produced by
following its lines, with a pen or pencil, through a transparent me-
dium, called tracing paper. The map, together with the title in
Roman letters, was engraved on stone and then printed, and a copy
of this printed title, thus made, was filed with the librarian. This, I
think, was a substantial compliance with the statute. A "printed"
copy can only be required for convenience of reading as compared
with ordinary script or writing. But a copy of the title which has
the form and appearance of a printed one, whether made by an im-
pression upon type or with a pen, with or without the aid of tracing
paper, is so far a printed copy. The result and not the means by
which the printing is accomplished, is the thing to be considered.
As legible a copy of the title may be printed or produced with a pen
as with type.

The defendants also object that it does not appear from the evi-
dence that the plaintiff deposited two copies of his map in the mail,
addressed to the librarian, within 10 days *after* its publication, as pro-
vided in section 4959 of the Revised Statutes; but, as they contend,
it appears such copies were deposited in the mail some time after the
map was printed, but *before* it was published or offered for sale. It
appears that the copies of the map were deposited in the library of
congress on January 23d—just one month after the copy of the title
was. At that time the mail from here to Washington was from 12
to 14 days in transit, so that it is quite certain that the copies were
mailed here near about January 10, 1874. The map was then printed,

of course, but how long before is not clear or material. Probably it had not then been formally published or offered for sale to the public. The plaintiff says in his testimony: "I sent them [the maps] on before I offered any copies for sale."

The objection then comes to this, that it is not sufficient to mail the copies after printing and before formal publication, but that the same must be sent to the librarian after publication. The purpose of the statute is to secure a collection in the library of congress of all the works copyrighted under the laws of the United States, and so two copies of each are required to be delivered or mailed to the librarian at an early period after publication—not less than 10 days. But if the proprietor of the work will take the pains to send the copies on the very day of publication, I see no reason why he may not. And if a day or two, or ten, should intervene between the printing and formal publication of a work, what purpose of the statute is not as well served if the proprietor should be diligent enough to mail or deliver the copies before such publication? None that I can conceive of. The statute must have a reasonable construction in this respect, having in view the purpose for which it was made. And this is, that the copies cannot be delivered or mailed later than 10 days after publication, but may be before.

From the evidence it appears that the defendants employed a civil engineer and draughtsman to compile or prepare the original of their map, and that in so doing he used the map of the plaintiff and three other older uncopyrighted maps, one of which was in manuscript, together with the public records and common observation, but no actual surveys. The city of Portland and its suburbs, which are the subject of these maps, having been improved and increased in population during the seven years that elapsed between their publication, that of the defendants contains some matter that is not found on the plaintiff's.

Questions of infringement of copyright are often very difficult to decide. The distinctions between the lawful and unlawful use of a prior publication are sometimes very fine and almost inappreciable. They have been called the metaphysics of the law. *Folsom* v. *Marsh,* 2 Story, 105. A person who bestows his skill and time in the surveys, research, and observation necessary to the making of a correct map of any place or locality, does not thereby prevent any other person from using the same means to accomplish the same end. The natural objects, public records, and surveys from which a map is made are open to the examination of any one. But it is clear that no person has a right to sit down and copy the map of another, and thereby defraud the latter of the profit of his labor and skill. *Gray* v. *Russel,* 1 Story, 18; *Blunt* v. *Patten,* 2 Paine, 397; *Cary* v. *Longman,* 1 East, 358; High, Inj. § 647. At the same time, it is not every use of a prior publication that is considered an unlawful infringement. *Bona fide* quotations from a book do not constitute such an infringe-

ment. But as absolute originality is not possible in the case of a map, a person may take material from prior publications, provided he bestows on it such skill and labor, in revision or otherwise, as to produce an original result. But the appropriations must not be denied, and the alterations must not be merely colorable, nor the result a servile imitation of the original. Cop. Law Copyr. 181, 183; High, Inj. § 647.

It is not very clear, from the evidence, what use was made of the plaintiff's map in the compilation of the defendants', unless it was substantially copied. It is admitted by the defendants, and their draughtsman so testifies, that it was used for comparison and correction. But this may mean more or less. The defendants' map may have been so far compared with and corrected by the plaintiff's as to make the former not only like the latter, but practically a copy of it. So far as the defendants' map was corrected by the plaintiff's, it was in effect a copy of it. Save the additions on the defendants' map, indicating the changes and improvements that had taken place since the publication of the plaintiff's map, there is no difference between them, except that the former is on a larger scale than the other, and has some lines printed in colors. And yet it is possible, although they are both so far alike, that one was not copied from the other, but only compiled from the same sources. But the probabilities are otherwise. There is a singular coincidence in the two maps that tends strongly to prove that one was copied from the other. On the plaintiff's map, block 106, in Caruthers' addition to Caruthers' addition, appears with a square piece out of the north-west corner, caused by a re-entering angle. This is the first time that said block appears in that form on any map. The plaintiff testifies that he entered it on his map in that form as the result of a survey made by himself, that he has since demonstrated to be incorrect. The defendants must have copied it from the plaintiff's map, and the fact that they copied such a singular error, which appears on no other map, indicates strongly that they copied the plaintiff's map indiscriminately and generally.

Another coincidence is quite as convincing in the same direction. The plaintiff's map shows that South First street, in Caruthers' addition to Caruthers' addition, does not conform in line and width to the same street in Caruthers' addition to Portland, and it is the only one except the defendants' on which the fact appears; while from the testimony of the plaintiff it is shown they do conform on the county records, and that he ascertained the want of conformity from actual survey. Now, as the defendants' map is not made from actual surveys, but from other maps and public records, they must have copied this feature of their work from the plaintiff's. And if the plaintiff was mistaken, either as to the error in the form of block 106 or the conformity of South First street on the county records, the defendants might easily have shown it. But they have not attempted to

do so, and the facts thereabout must be taken as stated by the witness. Add to this the admission made in the testimony of the defendants' draughtsman, to the effect that he got all he could out of the plaintiff's map, and "never thought of its being copyrighted," and the only reasonable inference from the premises is that in the compilation of the defendants' map they substantially copied the plaintiff's, and are therefore so far guilty of an infringement upon his copyright.

The plaintiff is entitled to a perpetual injunction against the defendants, as prayed for in his bill, and to an account of the profits realized by them on the sale of the infringing map, for which purpose the cause will be referred to the master.

---

## THE B & C.

*(District Court, N. D. Illinois.* November 5, 1883.)

**1. ADMIRALTY JURISDICTION—CANALS.**
A canal used by vessels engaged in interstate traffic as a public water-way, though entirely within the limits of one state having exclusive control of it, with power in such state to close it at any time, is a part of the "navigable waters of the United States," and subject to the jurisdiction of admiralty.

**2. CONTRIBUTORY NEGLIGENCE.**
The master of a vessel who, seeing that a collision is imminent, fails to use every means in his power to avert it, or abate the consequence, is guilty of contributory negligence, though the accident was caused by the negligence of another.

**3. DAMAGES—APPORTIONMENT.**
Damages on account of a loss occasioned by the negligence of both parties will be equally divided between them.

In Admiralty.

*Schuyler & Kremer*, for libelant.

*Robert Rae* and *A. B. Jenks*, for respondent.